UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

2013 SEP 17 PM 12: 47

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

UNITED STATES OF AMERICA, )
                            )
       Plaintiff, )
                            )
   v. )
                            )
JEFFREY WILSON and )     No. 1:13-cr-
CRAIG DUCEY, )
                            )
       Defendants. )   **1 : 13 -cr- 0190 SEB -TAB**

## I N D I C T M E N T

The Grand Jury Charges:

At times material to this Indictment:

### Relevant Persons and Entities

1)     IMPERIAL PETROLUEM, INC. (IMPERIAL) is a business operating in Evansville, Indiana, in the Southern District of Indiana. IMPERIAL's President and Chief Executive Officer was Defendant JEFFREY WILSON, an individual who resided in Evansville, Indiana.

2)     Shares of IMPERIAL were securities, as that term is defined in 15 U.S.C. §§ 77b(a)(1) & 78c(a)(10), registered with the United States Securities and Exchange Commission (SEC) pursuant to § 12(g) of the Securities Exchange Act of 1934, and publicly traded.

3)     As is required for a publicly traded company subject to the Securities Exchange Act of 1934, IMPERIAL filed with the SEC quarterly (Form 10-Q), annual (Form 10-K) and current (Form 8-K) reports that described its

1

business operations (including the business operations of its main subsidiaries) and reported financial results. These reports were also available to the public. Also, as required by the Securities Exchange Act of 1934, IMPERIAL's financial statements were submitted to independent auditors before they were filed with the SEC.

4)  E-BIOFUELS, LLC (E-BIOFUELS) was a business in Middletown, Indiana, that operated a production plant which could process animal fats and vegetable oils ("feedstock") into a renewable fuel. This was accomplished through a process called "transesterification," which involved mixing feedstock with alcohol and a catalyst in a heated system of tanks and pipes. The process would cause chemical reactions within the mixture. The resulting product was called "biodiesel" and was also known as "B100."

5)  Defendant CRAIG DUCEY was a resident of Indiana, who served as the President of E-BIOFUELS at various times.

6)  IMPERIAL purchased E-BIOFUELS on or about May 24, 2010. From IMPERIAL's purchase of E-BIOFUELS through July 31, 2011, E-BIOFUELS generated 97% or more of IMPERIAL's total operating income.

7)  The vast majority of E-BIOFUELS' revenue (and, thus, the vast majority of IMPERIAL's total operating income) was not generated from the sale of biodiesel that E-BIOFUELS had produced through transesterification. As explained below, the vast majority of E-BIOFUELS' revenue (and, thus, the vast majority of IMPERIAL's total operating income) was generated from the purchase and re-sale of biodiesel produced by somebody else.

## Renewable Fuel Incentives

8)      The Energy Independence and Security Act of 2007 required the U.S. Environmental Protection Agency (EPA) and the U.S. Internal Revenue Service (IRS) to encourage the production and use of renewable fuel in the United States. Specifically, this Act directed these agencies to write regulations and administer tax credits to ensure an increase in the amount of such fuel through a taxpayer-funded incentive program and a mandate that applied to petroleum refiners and importers.

9)      From May 2007 through the present, petroleum refiners and importers were required by federal law to have renewable fuel in their product mixes. Petroleum refiners and importers, who were known as "obligated parties," could meet this obligation by purchasing credits from renewable fuel producers like E-BIOFUELS. These credits were called "renewable identification numbers" or "RINs."

10)      Renewable fuel producers could generate RINs by producing qualifying renewable fuels, including biodiesel, in compliance with EPA regulations. Then, the producers could sell the RINs to obligated parties or middlemen, usually by selling a volume of biodiesel with a number of RINs "assigned" to that volume.

11)      It was illegal to generate RINs for a volume of biodiesel that was not actually produced in compliance with EPA regulations. In particular, it was illegal to generate RINs unless the RINs were based on renewable fuel and

the production process used to make that fuel met specific criteria. Moreover, it was illegal to generate RINs more than once for any given volume of biodiesel.

12) Under EPA's regulations, there were circumstances that allowed a RIN owner to separate RINs from the volume of biodiesel to which they had been assigned. After separation, RINs could be bought and sold without buying and selling the associated fuel. From then on, the "RIN-stripped" biodiesel could never be used to generate more RINs.

13) In 2009, retroactively in 2010, and in 2011, blenders could apply for fully refundable biodiesel mixture tax credits if they blended B100 with petroleum-based diesel and then sold the resulting mixture for use as a fuel. If blenders complied with IRS rules and submitted appropriate "Certificates for Biodiesel," they could receive a one dollar per gallon tax credit, paid by the U.S. Department of Treasury. In the biodiesel industry, this program was known as the "blender's credit," "blender's tax credit" and the "excise tax credit (ETC)." Thus, some biodiesel buyers were willing to pay a premium for B100, because they could earn the one dollar per gallon credit by blending it with petroleum diesel.

14) Under IRS rules, blenders could qualify for the blender's tax credit by mixing a very small amount of petroleum diesel with B100. After this minimal blending was done, the resulting product was known as "B99.9" or "B99," which meant that it was 99.9% biodiesel and 0.1% petroleum diesel.

15) It was illegal to claim a blender's tax credit for biodiesel unless the fuel was actually produced, blended and sold in compliance with IRS rules. In

4

particular, it was illegal to claim the credit without a true and accurate Certificate for Biodiesel and it was illegal to claim the credit more than once for any given volume of biodiesel. E-BIOFUELS was an IRS-registered agri-biodiesel producer that issued Certificates for Biodiesel to its customers.

16) Because of the value of RINs and the blender's tax credit, a gallon of B100 with assigned RINs and an available tax credit was worth much more than a gallon of RIN-stripped B99. At times, the value of the incentives significantly increased the price that biodiesel would fetch without the incentives.

### JEFFREY WILSON and CRAIG DUCEY Hid E-BIOFUELS's Illegal Business Model From IMPERIAL's Investors, Shareholders and Auditors

17) From at least early 2010 through at least the end of 2011, E-BIOFUELS purchased millions of gallons of RIN-stripped B99 from CARAVAN TRADING, LLC and/or affiliated companies (CARAVAN). E-BIOFUELS illegally sold nearly all of that fuel to its customers as B100 with RINs.

18) This illegal business model was not disclosed to IMPERIAL's investors, shareholders or auditors.

19) JEFFREY WILSON and CRAIG DUCEY knew that E-BIOFUELS was purchasing and reselling biodiesel instead of producing its own fuel from virgin feedstocks through transesterification.

20) Nevertheless, from at least mid-2010 through at least late 2011, JEFFREY WILSON and CRAIG DUCEY falsely represented to IMPERIAL's investors, shareholders and auditors that E-BIOFUELS produced its own

biodiesel from virgin feedstocks—such as premium white grease (a/k/a choice white grease or chicken fat)—through transesterification.

<h3 align="center">**False SEC Filings**</h3>

21)    JEFFREY WILSON was responsible for: (a) the content of IMPERIAL's quarterly and annual reports filed with the SEC; and (b) certifying the accuracy of those reports.

22)    At times material to this Indictment, IMPERIAL's quarterly and annual reports filed with the SEC:

(a)    falsely represented that E-BIOFUELS produced biodiesel instead of purchasing and reselling biodiesel that had been fully or partially produced by someone else; and

(b)    misrepresented that E-BIOFUELS produced biodiesel from virgin feedstocks—primary premium white grease (a/k/a choice white grease or chicken fat)—through transesterification.

## IMPERIAL's 2010 Annual Report Filed with the SEC on or about November 15, 2010

23)    IMPERIAL's 2010 annual report filed with the SEC (*i.e.*, its Form 10-K for its fiscal year ended July 31, 2010) ("IMPERIAL's 2010 Annual Report") falsely stated "[d]uring the period from May 24, 2010 through July 31, 2010 the [E-BIOFUELS] plant produced approximately 1.8 million gallons of biodiesel." Similarly, the footnotes to the financial statements contained in

IMPERIAL's 2010 Annual Report misrepresented that IMPERIAL's principal business includes "biodiesel production."

24)    IMPERIAL's 2010 Annual Report also falsely represented that E-BIOFUELS uses premium white grease (a/k/a choice white grease or chicken fat) as its primary feedstock to produce biodiesel through transesterification; for example, IMPERIAL's 2010 Annual Report stated:

> The [E-BIOFUELS] plant operates two process trains using traditional catalyst technology to produce biodiesel from vegetable, mineral and animal oils and greases. The primary feedstock used to make biodiesel at the facility is premium white grease (chicken fat) which is purchased as needed from various suppliers in open-market transactions. Additional feedstocks that could be used, depending upon cost, are: vegetable oils, mineral oils and animal oils and fats. Biodiesel is a petroleum diesel fuel substitute that has gained widespread acceptance throughout the world as a renewable alternative to regular petroleum diesel. In general biodiesel is added to diesel in amounts ranging from 5% to 20% by volume. The biodiesel produced, which represents approximately 80% of the feedstock input to the plant (due to losses and glycerin production, a by-product of the production process) is required to meet stringent standards set by the federal government in order to be used as transportation fuel additives.

25)    IMPERIAL's 2010 Annual Report does not inform the readers of that document that E-BIOFUELS' primary business model was the purchase and resale of biodiesel that had been fully or partially produced by someone else.

26)    IMPERIAL's 2010 Annual Report stated that revenue and other income from "Biodiesel" accounted for more than 97% of IMPERIAL's total operating income for the period covered by that report (i.e., August 1, 2009 to

July 31, 2010). E-BIOFUELS accounted for all or essentially all of IMPERIAL's "Biodiesel" revenue and other income during this time period.

27)    JEFFREY WILSON signed IMPERIAL's 2010 Annual Report filed with the SEC.

28)    IMPERIAL's 2010 Annual Report was never amended to correct the misstatements and omissions described above.

**IMPERIAL's Quarterly Report for the First Quarter of 2011
Filed with the SEC on or about December 15, 2010**

29)    IMPERIAL's quarterly report for the first quarter of fiscal year 2011 (*i.e.*, its Form 10-Q for the three-month period ended October 31, 2010) ("IMPERIAL's Quarterly Report for the First Quarter of 2011"), misrepresented that IMPERIAL's principal businesses were "biodiesel production and sales and oil and gas exploration and production in the United States."

30)    IMPERIAL's Quarterly Report for the First Quarter of 2011 also misrepresented that E-BIOFUELS uses virgin feedstocks, primarily "premium white grease (chicken fat)" to produce biodiesel through transesterification.

31)    IMPERIAL's Quarterly Report for the First Quarter of 2011 did not inform the readers of that document that E-BIOFUELS' primary business model was the purchase and resale of biodiesel that had been fully or partially produced by someone else.

32)    IMPERIAL's Quarterly Report for the First Quarter of 2011 stated that "Biofuels Revenue" accounted for more than 99% of IMPERIAL's total operating income for the period covered by the report (*i.e.*, August 1, 2010 to

October 31, 2010). E-BIOFUELS accounted for all or essentially all of IMPERIAL's "Biofuels Revenue" during this time period.

33) IMPERIAL's Quarterly Report for the First Quarter of 2011 failed to correct the misstatements and omissions contained in IMPERIAL's 2010 Annual Report.

34) JEFFREY WILSON signed IMPERIAL's Quarterly Report for the First Quarter of 2011.

35) IMPERIAL's Quarterly Report for the First Quarter of 2011 was never amended to correct the misstatements and omissions described above.

**IMPERIAL's Quarterly Report for the Second Quarter of 2011**
**Filed with the SEC on or about March 15, 2011**

36) IMPERIAL's quarterly report for the second quarter of fiscal year 2011 (*i.e.*, its Form 10-Q for the three-month period ended January 31, 2011) ("IMPERIAL's Quarterly Report for the Second Quarter of 2011"), misrepresented that IMPERIAL's principal businesses were "biodiesel production and sales and oil and gas exploration and production in the United States."

37) IMPERIAL's Quarterly Report for the Second Quarter of 2011 also misrepresented that E-BIOFUELS uses virgin feedstocks, primarily "premium white grease (chicken fat)" to produce biodiesel through transesterification.

38) IMPERIAL's Quarterly Report for the Second Quarter of 2011 did not inform the readers of that document that E-BIOFUELS' primary business model was the purchase and resale of biodiesel that had been fully or partially produced by someone else.

39)     IMPERIAL's Quarterly Report for the Second Quarter of 2011 stated that "Biofuels revenue" accounted for more than 99% of IMPERIAL's total operating income for the period covered by the report (*i.e.*, November 1, 2010 to January 31, 2011).  E-BIOFUELS accounted for all or essentially all of IMPERIAL's "Biofuels revenue" during this time period.

40)     IMPERIAL's Quarterly Report for the Second Quarter of 2011 failed to correct the misstatements and omissions contained in IMPERIAL's 2010 Annual Report and/or IMPERIAL's Quarterly Report for the First Quarter of 2011.

41)     JEFFREY WILSON signed IMPERIAL's Quarterly Report for the Second Quarter of 2011.

42)     IMPERIAL's Quarterly Report for the Second Quarter of 2011 was never amended to correct the misstatements and omissions described above.

**IMPERIAL's Quarterly Report for the Third Quarter of 2011
Filed with the SEC on or about June 14, 2011**

43)     IMPERIAL's quarterly report for the third quarter of fiscal year 2011 (*i.e.*, its Form 10-Q for the three-month period ended April 30, 2011) ("IMPERIAL's Quarterly Report for the Third Quarter of 2011"), misrepresented that IMPERIAL's principal businesses were "biodiesel production and sales, through its wholly owned subsidiary, e-Biofuels, LLC and oil and gas exploration and production in the United States."

44)     IMPERIAL's Quarterly Report for the Third Quarter of 2011 also misrepresented that E-BIOFUELS uses virgin feedstocks, primarily "waste

greases and oils including premium white grease (chicken fat)" to produce biodiesel through transesterification.

45)     IMPERIAL's Quarterly Report for the Third Quarter of 2011 did not inform the readers of that document that E-BIOFUELS' primary business model was the purchase and resale of biodiesel that had been fully or partially produced by someone else.

46)     IMPERIAL's Quarterly Report for the Third Quarter of 2011 stated that "Biofuels revenue" accounted for more than 99% of IMPERIAL's total operating income for the period covered by the report (*i.e.*, February 1, 2011 to April 30, 2011). E-BIOFUELS accounted for all or essentially all of IMPERIAL's "Biofuels revenue" during this time period.

47)     IMPERIAL's Quarterly Report for the Third Quarter of 2011 failed to correct the misstatements and omissions contained in IMPERIAL's 2010 Annual Report, IMPERIAL's Quarterly Report for the First Quarter of 2011 and/or IMPERIAL's Quarterly Report for the Second Quarter of 2011.

48)     JEFFREY WILSON signed IMPERIAL's Quarterly Report for the Third Quarter of 2011.

49)     IMPERIAL's Quarterly Report for the Third Quarter of 2011 was never amended to correct the misstatements and omissions described above.

**IMPERIAL's 2011 Annual Report Filed with the SEC on or about October 21, 2011**

50)     IMPERIAL's 2011 annual report filed with the SEC (*i.e.*, its Form 10-K for its fiscal year ended July 31, 2011) ("IMPERIAL's 2011 Annual Report"), contained multiple false statements and omissions that perpetuated

the false impression that E-BIOFUELS produced biodiesel from virgin feedstocks through transesterification. For example, IMPERIAL's 2011 Annual Report stated:

(a) "We produce our biodiesel from a wide variety of feedstocks, including soy oil, inedible animal fat, used cooking oil and inedible corn oil."

(b) "We are reliant on certain strategic raw materials (such as soybean oil, waste greases and fats and methanol) for our operations."

(c) "Our ability to use a wide range of feedstocks gives us the flexibility to quickly respond to changes in feedstock pricing to maintain our feedstock cost advantage...As different feedstocks are delivered to the plant, they are segregated into our feedstock storage tanks, tested and the plant is tuned to optimize the processing of that specific feedstock."

(d) "We generally sell B100 to our customers."

(e) "[The E-BIOFUELS] facility currently has the capacity to produce approximately 30-35 million gallons of biodiesel annually."

51) IMPERIAL's 2011 Annual Report also stated that a BQ 9000 certification is administered by the National Biodiesel Board through the National Biodiesel Accreditation Commission and requires companies to

"possess a quality manual and quality control system and employ best practices in biodiesel sampling, testing, blending, shipping, storage and distribution." IMPERIAL's 2011 Annual Report falsely stated that the E-BIOFUELS plant is a "BQ 9000 certified facility."

52)     IMPERIAL's 2011 Annual Report also falsely stated that "[a]ll of the 2011 services [performed by IMPERIAL's outside auditor] were approved by the Audit Committee."

53)     IMPERIAL's 2011 Annual Report does not inform the readers of that document that E-BIOFUELS' primary business model was the purchase and resale of biodiesel that had been fully or partially produced by someone else.

54)     IMPERIAL's 2010 Annual Report stated that its "biodiesel business" accounted for more than 99% of IMPERIAL's total revenues for the period covered by that report (*i.e.*, August 1, 2010 to July 31, 2011). E-BIOFUELS accounted for all or essentially all of IMPERIAL's revenue generating "biodiesel business" during this time period.

55)     IMPERIAL's 2011 Annual Report failed to correct the misstatements and omissions contained in IMPERIAL's 2010 Annual Report, IMPERIAL's Quarterly Report for the First Quarter of 2011, IMPERIAL's Quarterly Report for the Second Quarter of 2011 and/or IMPERIAL's Quarterly Report for the Third Quarter of 2011.

56)     JEFFREY WILSON signed IMPERIAL's 2011 Annual Report filed with the SEC.

57) IMPERIAL's 2011 Annual Report was never amended to correct the misstatements and omissions described above.

**JEFFREY WILSON Signed False Certifications of**
**IMPERIAL's Annual and Quarterly Reports**

58) At the end of each of the quarterly and annual reports referenced above (*i.e.*, IMPERIAL's 2010 Annual Report, IMPERIAL's Quarterly Report for the First Quarter of 2011, IMPERIAL's Quarterly Report for the Second Quarter of 2011, IMPERIAL's Quarterly Report for the Third Quarter of 2011 and IMPERIAL's 2011 Annual Report), JEFFREY WILSON certified that he had reviewed the report and that, based on his knowledge:

    (a)    The report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made [not misleading]" with respect to the period covered by this report; and

    (b)    "[T]he financial statements, and other financial information included in this [report] fairly present in all material respects the financial condition, results of operations and cash flows" of IMPERIAL with respect to the periods presented in this report.

59) At the end of each of the quarterly and annual reports referenced above (*i.e.,* IMPERIAL's 2010 Annual Report, IMPERIAL's Quarterly Report for the First Quarter of 2011, IMPERIAL's Quarterly Report for the Second Quarter of 2011, IMPERIAL's Quarterly Report for the Third Quarter of 2011 and IMPERIAL's 2011 Annual Report), JEFFREY WILSON executed a certification

required by 18 U.S.C. § 1350 that did not comport with the requirements of that statute. Among other things, Section 1350 requires chief executive officers of most publicly traded companies to certify, in all periodic SEC reports containing financial statements of the company, that the report "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that the information in the report "fairly represents, in all material respects," the company's financial condition and the results of its operations. Because of the failure to disclose E-BIOFUELS' true business model and the related false statements and omissions, among other things, IMPERIAL's quarterly and annual reports referenced above did not fully comply with 13(a) or 15(d) of the Securities Exchange Act of 1934, nor did they fairly represent IMPERIAL's financial condition and the results of its operations.

### JEFFREY WILSON and CRAIG DUCEY Deceived IMPERIAL's Auditor

60)     In or about December 2009, JEFFREY WILSON hired Weaver, Martin & Samyn ("Weaver Martin") to be the outside auditor for IMPERIAL's 2010 Annual Report.

61)     In or about September 2010, in connection with IMPERIAL's 2010 Annual Report, CRAIG DUCEY, directly or indirectly, falsely stated to representatives of Weaver Martin that E-BIOFUELS produces biodiesel through transesterification.

62)     In or about September 2010, in connection with IMPERIAL's 2010 Annual Report, CRAIG DUCEY did not disclose to Weaver Martin the true nature of E-BIOFUELS' business model.

63)    In or about September 2010, in connection with IMPERIAL's 2010 Annual Report, JEFFREY WILSON falsely stated to representatives of Weaver Martin that E-BIOFUELS purchases chicken grease and uses it to make biodiesel.

64)    In or about September 2010, in connection with IMPERIAL's 2010 Annual Report, JEFFREY WILSON did not disclose to Weaver Martin the true nature of E-BIOFUELS' business model.

65)    In connection with IMPERIAL's 2010 Annual Report, JEFFREY WILSON provided to Weaver Martin a management certification letter dated November 15, 2010 that contained false and misleading statements. In that letter, JEFFREY WILSON falsely represented that:

(a)    all financial records and related data for IMPERIAL had been made available to Weaver Martin;

(b)    there are no material transactions that have not been properly recorded in the accounting records underlying IMPERIAL's financial statements;

(c)    there are no violations or possible violations of laws or regulations whose effect should be considered for disclosure in the financial statements or as a basis for recording a loss contingency; and

(d)    no events have occurred subsequent to the balance sheet date that would require adjustment to, or disclosure in, the financial statements.

66)     In or about December 2010, JEFFREY WILSON hired Weaver

Martin to be the outside auditor for IMPERIAL's 2011 Annual Report.

67)     In connection with IMPERIAL's 2011 Annual Report, CRAIG

DUCEY provided to Weaver Martin a management certification letter dated

October 5, 2011 that contained false and misleading statements.  In that letter,

CRAIG DUCEY falsely represented that:

    (a)    all financial records and related data for E-BIOFUELS had

          been made available to Weaver Martin;

    (b)    there are no material transactions that have not been

          properly recorded in the accounting records underlying

          E-BIOFUELS's financial statements;

    (c)    CRAIG DUCEY has no knowledge of any allegation of fraud

          or suspected fraud affecting E-BIOFUELS;

    (d)    there are no violations or possible violations of laws or

          regulations whose effect should be considered for disclosure

          in the financial statements or as a basis for recording a loss

          contingency; and

    (e)    no events have occurred subsequent to the balance sheet

          date that would require adjustment to, or disclosure in, the

          financial statements.

68)     In or about September 2011, in connection with IMPERIAL's 2011

Annual Report, JEFFREY WILSON falsely stated to representatives of Weaver

Martin that he had no knowledge of fraud or suspected fraud affecting IMPERIAL and/or E-BIOFUELS.

69)     In or about September 2011, in connection with IMPERIAL's 2011 Annual Report, JEFFREY WILSON did not disclose to Weaver Martin the true nature of E-BIOFUELS' business model.

70)     In connection with IMPERIAL's 2011 Annual Report, JEFFREY WILSON provided to Weaver Martin a management certification letter dated October 21, 2011 that contained false and misleading statements. In that letter, JEFFREY WILSON falsely represented that:

(a)     all financial records and related data for IMPERIAL and E-BIOFUELS had been made available to Weaver Martin;

(b)     there are no material transactions that have not been properly recorded in the accounting records underlying IMPERIAL's financial statements;

(c)     all minutes or summaries of meetings of stockholders, directors and committees of directors had been made available to Weaver Martin;

(d)     JEFFREY WILSON has no knowledge of any allegation of fraud or suspected fraud affecting IMPERIAL or E-BIOFUELS;

(e)     there are no violations or possible violations of laws or regulations whose effect should be considered for disclosure

in the financial statements or as a basis for recording a loss

contingency; and

(f)     no events have occurred subsequent to the balance sheet

date that would require adjustment to, or disclosure in, the

financial statements.

**IMPERIAL's False and Misleading Press Releases Filed with the SEC**

71)     In September 2011, IMPERIAL issued a press release ("September

2011 Press Release"). The September 2011 Press Release quotes JEFFREY

WILSON as stating that the E-BIOFUELS' facility was operating "at capacity"

and that IMPERIAL expects to produce and sell approximately 34 million

gallons of biodiesel in fiscal year 2012. These statements were false and

misleading. Except for a small amount, E-BIOFUELS was not (and had not

been) producing any biodiesel at the time it issued the September 2011 Press

Release.

72)     The September 2011 Press Release was included in a current

report ("IMPERIAL's September 2011 Current Report") that IMPERIAL filed with

the SEC. JEFFREY WILSON signed IMPERIAL's September 2011 Current

Report.

73)     In October 2011, IMPERIAL issued a press release ("October 2011

Press Release") misrepresenting that E-BIOFUELS was engaged in "biodiesel

and biofuels production." The press release stated that IMPERIAL sold more

than 26 million gallons of biodiesel during fiscal year 2011. The press release

did not disclose that the vast majority of those gallons were the result of E-

BIOFUELS buying and reselling biodiesel that had been fully or partially produced by someone else.

74) The October 2011 Press Release was included in a current report ("IMPERIAL's October 2011 Current Report") that IMPERIAL filed with the SEC. JEFFREY WILSON signed IMPERIAL's October 2011 Current Report.

<b><u>Fraudulent Statements and Omissions</u></b><br/><b><u>Made to Actual and Potential Investors</u></b>

**JEFFREY WILSON Defrauded Actual and Potential Investors by Causing IMPERIAL to Issue False and Misleading Annual, Quarterly and Current Reports**

75) The above-described quarterly reports (*i.e.*, Forms 10-Q), annual reports (*i.e.*, Forms 10-K) and current reports (*i.e.*, Forms 8-K) by IMPERIAL were electronically uploaded to a public database called EDGAR, and were thereby made available in interstate commerce to investors in securities and others for free through the internet, that is, by electronic access through the use of interstate wires.

76) JEFFREY WILSON caused the following reports to be electronically uploaded to the EDGAR database: (i) IMPERIAL's 2010 Annual Report; (ii) IMPERIAL's Quarterly Report for the First Quarter of 2011; (iii) IMPERIAL's Quarterly Report for the Second Quarter of 2011; (iv) IMPERIAL's Quarterly Report for the Third Quarter of 2011; (v) IMPERIAL's 2011 Annual Report; (vi) IMPERIAL's September 2011 Current Report; and (vii) IMPERIAL's October 2011 Current Report.

**JEFFREY WILSON and CRAIG DUCEY Defrauded a Hedge Fund Investor**

77)     In or about the summer of 2011, JEFFREY WILSON, CRAIG DUCEY and others tried to convince COMPANY A to invest in IMPERIAL securities.

78)     In or about July 2011, COMPANY A agreed to provide IMPERIAL up to $27,500,000 in exchange for notes and IMPERIAL stock contingent upon the satisfactory completion of its due diligence review (*i.e.,* the process by which a company confirms the material facts with respect to a business transaction).

79)     In or about July and August 2011, JEFFREY WILSON provided COMPANY A with IMPERIAL's most recent annual and quarterly reports and other documents. Those documents contained false statements and omissions including, among other things, the failure to disclose E-BIOFUELS' true business model and affirmative misrepresentations about that business model. JEFFREY WILSON provided those documents to COMPANY A by electronically uploading them to a private database (the Electronic Data Room) through the internet, that is, by electronic transmission through the use of interstate wires.

80)     In or about July 2011, COMPANY A hired COMPANY B—a renewable energy consulting firm—to advise it during the due diligence process.

81)     In or about July and/or August 2011, CRAIG DUCEY provided to JEFFREY WILSON documents containing false statements and omissions regarding E-BIOFUELS' true business model, including an engineering report.

CRAIG DUCEY understood that JEFFREY WILSON would provide those documents to COMPANY A and/or COMPANY B.

82) In or about July and/or August 2011, JEFFREY WILSON provided to COMPANY B documents that contained false statements and omissions including, among other things, the failure to disclose E-BIOFUELS' true business model and affirmative misrepresentations about that business model. JEFFREY WILSON provided those documents to COMPANY B by e-mail, that is, by electronic transmission through the use of interstate wires.

83) In or about August 2011, JEFFREY WILSON, CRAIG DUCEY and others participated in a telephone call with representatives of COMPANY B. During that call, CRAIG DUCEY made false statements and omitted material information about E-BIOFUELS' true business model.

84) During the August 2011 telephone call with COMPANY B, CRAIG DUCEY told the representatives of COMPANY B that certain documents provided to COMPANY A as part of the due diligence process (*i.e.*, documents that had been electronically uploaded to the Electronic Data Room and/or e-mailed to COMPANY A and/or COMPANY B) established that E-BIOFUELS was in compliance with the applicable government regulations. As of the time of that telephone call, both JEFFREY WILSON and CRAIG DUCEY knew that those documents contained false statements and omissions about E-BIOFUELS' true business model. JEFFREY WILSON did not correct any of the misstatements or omissions made by CRAIG DUCEY during the August 2011 telephone call with COMPANY B.

**JEFFREY WILSON Defrauded PIPE Investors**

85)   In September 2011, JEFFREY WILSON gave a presentation to prospective investors about IMPERIAL and E-BIOFUELS. JEFFREY WILSON's presentation included a video about E-BIOFUELS that contained false statements and omissions regarding E-BIOFUELS' business model.

86)   Some of those investors invested in IMPERIAL through a type of transaction known as a Private Investment in Public Equity securities ("PIPE"). In the written securities agreement for the PIPE, IMPERIAL falsely represented, among other things, that its filings with the SEC during the preceding two years do not contain any untrue statements nor do they omit any material information. JEFFREY WILSON signed this written securities agreement on behalf of IMPERIAL.

87)   JEFFREY WILSON and the PIPE investors used e-mail to send and receive executed signature pages for the PIPE written securities agreement, that is, by electronic transmission through the use of interstate wires.

88)   Pursuant to the written securities agreement, the PIPE investors invested more than $3.1 million in IMPERIAL. The money was transferred to a bank account controlled by IMPERIAL and JEFFREY WILSON via wire transfer, that is, by electronic transmission through the use of interstate wires.

## COUNT 1
### (Fraud in Connection with the Purchase or Sale of Securities)

89)   Paragraphs 1 through 88 of this Indictment are realleged and expressly incorporated herein as if set out in full.

90) On various dates between in or about November 2010 and in or about October 2011, in the Southern District of Indiana and elsewhere,

JEFFREY WILSON,

a defendant herein, knowingly and willfully, by use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of a national securities exchange, did directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase or sale of a security in violation of 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5), by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit, in connection with the purchase or sale of securities.

All in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5.

## COUNT 2
### (Fraud in the Offer or Sale of Securities)

91) Paragraphs 1 through 88 of this Indictment are realleged and expressly incorporated herein as if set out in full.

92) On various dates between in or about November 2010 and in or about October 2011, in the Southern District of Indiana and elsewhere,

JEFFREY WILSON and

CRAIG DUCEY,

defendants herein, willfully, by use of the means or instrumentalities of

interstate commerce or of the mails, did directly and indirectly: (a) employ

devices, schemes and artifices to defraud; (b) obtain money or property by

means of any untrue statement of a material fact or any omission to state a

material fact necessary in order to make statements made, in light of the

circumstances under which they were made, not misleading; and (c) engage in

transactions, practices, and courses of business which would and did operate

as a fraud and deceit upon members of the investing public, in connection with

the offer or sale of securities.

All in violation of 15 U.S.C. §§ 77q(a) and 77x, and 18 U.S.C. § 2.

## COUNTS 3 – 4
### (Material False Statements in Required Filings with the SEC)

93)     Paragraphs 1 through 88 of this Indictment are realleged and

expressly incorporated herein as if set out in full.

94)     On or about the dates set forth below, in the Southern District of

Indiana and elsewhere,

JEFFREY WILSON and

CRAIG DUCEY,

defendants herein, in applications, reports and documents required to be filed

with the SEC under the Securities Exchange Act of 1934 and rules and

regulations thereunder, knowingly and willfully made and caused to be made

statements that were false and misleading with regard to material facts, to wit: the filings listed below:

| COUNT | FILING | APPROXIMATE DATE OF FILING |
|-------|--------|---------------------------|
| 3 | Form 10-K for IMPERIAL for the fiscal year ended July 31, 2010 (*i.e.*, IMPERIAL's 2010 Annual Report) | November 15, 2010 |
| 4 | Form 10-K for IMPERIAL for the fiscal year ended July 31, 2011 (*i.e.*, IMPERIAL's 2011 Annual Report) | October 21, 2011 |

All in violation of 15 U.S.C. § 78ff, and 18 U.S.C. § 2.

## COUNTS 5 - 9
### (Material False Statements in Required Filings with the SEC)

95)    Paragraphs 1 through 88 of this Indictment are realleged and expressly incorporated herein as if set out in full.

96)    In or about October 2011, in the Southern District of Indiana and elsewhere,

JEFFREY WILSON,

a defendant herein, in applications, reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and rules and regulations thereunder, knowingly and willfully made and caused to be made statements that were false and misleading with regard to material facts, to wit: the filings listed below:

| COUNT | FILING | APPROXIMATE DATE OF FILING |
|:---:|:---|:---|
| 5 | Form 10-Q for IMPERIAL for the fiscal quarter ended October 31, 2010 (*i.e.*, IMPERIAL's Quarterly Report for the First Quarter of 2011) | December 15, 2010 |
| 6 | Form 10-Q for IMPERIAL for the fiscal quarter ended January 31, 2011 (*i.e.*, IMPERIAL's Quarterly Report for the Second Quarter of 2011) | March 15, 2011 |
| 7 | Form 10-Q for IMPERIAL for the fiscal quarter ended April 30, 2011 (*i.e.*, IMPERIAL's Quarterly Report for the Third Quarter of 2011) | June 14, 2011 |
| 8 | Form 8-K for IMPERIAL dated September 21, 2011 (*i.e.*, IMPERIAL's September 2011 Current Report) | September 22, 2011 |
| 9 | Form 8-K for IMPERIAL dated October 11, 2011 (*i.e.*, IMPERIAL's October 2011 Current Report) | October 12, 2011 |

All in violation of 15 U.S.C. § 78ff.

## COUNTS 10 - 11
### (Wrongful Certifications of Annual Reports (Form 10-Ks) by Corporate Officer)

97)     Paragraphs 1 through 88 of this Indictment are realleged and expressly incorporated herein as if set out in full.

98)     On or about the dates set forth below, in the Southern District of Indiana and elsewhere,

JEFFREY WILSON,

a defendant herein, being the Chief Executive Officer of IMPERIAL, or the equivalent thereof, did knowingly certify and cause to be certified statements that 18 U.S.C. § 1350 requires to appear in periodic reports containing financial statements, filed by IMPERIAL with the SEC under the Securities Exchange Act of 1934 and rules and regulations thereunder, that is, he certified that,

[T]o the best of his knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

while knowing that said periodic reports did not comport with all requirements of 18 U.S.C. § 1350, in that the information in each periodic report did not fully comply with the requirements of the above referenced provisions of the Securities and Exchange Act of 1934, and did not fairly present, in all material respects, IMPERIAL's financial condition and results of operations, the periodic reports being as follows:

| COUNT | FILING | APPROXIMATE DATE OF FILING |
|-------|--------|----------------------------|
| 10 | Form 10-K for IMPERIAL for the fiscal year ended July 31, 2010 (*i.e.*, IMPERIAL's 2010 Annual Report) | November 15, 2010 |
| 11 | Form 10-K for IMPERIAL for the fiscal year ended July 31, 2011 (*i.e.*, IMPERIAL's 2011 Annual Report) | October 21, 2011 |

All in violation of 18 U.S.C. § 1350(c)(1).

## COUNTS 12 - 14
### (Wrongful Certifications of Quarterly Reports (Form 10-Qs) by Corporate Officer)

99)   Paragraphs 1 through 88 of this Indictment are realleged and expressly incorporated herein as if set out in full.

100)   On or about the dates set forth below, in the Southern District of Indiana and elsewhere,

JEFFREY WILSON,

a defendant herein, being the Chief Executive Officer of IMPERIAL, or the equivalent thereof, did knowingly certify and cause to be certified statements that 18 U.S.C. § 1350 requires to appear in periodic reports containing financial statements, filed by IMPERIAL with the SEC under the Securities Exchange Act of 1934 and rules and regulations thereunder, that is, he certified that,

[T]o the best of his knowledge:

1. The quarterly report fully complies with the requirements of Section 13(a) of the Securities [Exchange] Act of 1934; and

2. The information contained in the quarterly report fairly presents, in all material respects, the financial condition and results of operations of the Company.

while knowing that said periodic reports did not comport with all requirements of 18 U.S.C. § 1350, in that the information in each periodic report did not fully comply with the requirements of Section 13(a) of the Securities and Exchange Act of 1934, and did not fairly present, in all material respects, IMPERIAL's financial condition and results of operations, the periodic reports being as follows:

| COUNT | FILING | APPROXIMATE DATE OF FILING |
|---|---|---|
| 12 | Form 10-Q for IMPERIAL for the fiscal quarter ended October 31, 2010 (*i.e.*, IMPERIAL's Quarterly Report for the First Quarter of 2011) | December 15, 2010 |
| 13 | Form 10-Q for IMPERIAL for the fiscal quarter ended January 31, 2011 (*i.e.*, IMPERIAL's Quarterly Report for the Second Quarter of 2011) | March 15, 2011 |
| 14 | Form 10-Q for IMPERIAL for the fiscal quarter ended April 30, 2011 (*i.e.*, IMPERIAL's Quarterly Report for the Third Quarter of 2011) | June 14, 2011 |

All in violation of 18 U.S.C. § 1350(c)(1).

## COUNTS 15 - 20
### (Material Omissions and False Statements
### by Corporate Officer to Accountant)

101) Paragraphs 1 through 88 of this Indictment are realleged and expressly incorporated herein as if set out in full.

102) Between in or about June 2010 and in or about October 2011, in the Southern District of Indiana and elsewhere,

JEFFREY WILSON and

CRAIG DUCEY,

defendants herein, being officers (or persons performing the same function as an officer) of an issuer of securities regulated under the Securities Exchange Act of 1934, to wit, IMPERIAL, did knowingly and willfully, and directly and indirectly:

(a) take actions to manipulate, mislead, and fraudulently influence independent public or certified public accountants engaged in the performance of audits and reviews of the financial statements of IMPERIAL that were required to be filed with the SEC, knowing, and it being that defendants should have known, that such action, if successful, could result in rendering IMPERIAL's financial statements materially misleading; and

(b) make and cause to be made materially false or misleading statements, and did omit to state and did cause another person to omit to state, material facts necessary in order to make such statements, in the light of the circumstances under which such

statements were made, not misleading, to an accountant: (i) in connection with an audit or examination of IMPERIAL's financial statements required to be made pursuant to the Securities Exchange Act of 1934 and rules and regulations thereunder; and (ii) in the preparation and filing of documents and reports required to be filed with the SEC under the Securities Exchange Act of 1934 and rules and regulations thereunder, as follows:

| COUNT | METHOD BY WHICH STATEMENT OR OMISSION MADE | STATEMENT OR OMISSION RELATED TO | APPROXIMATE DATE OF STATEMENT OR OMISSION |
|-------|----------|----------|----------|
| 15 | CRAIG DUCEY conversation with IMPERIAL's auditor | Audit related to IMPERIAL's fiscal year ended July 31, 2010 (*i.e.*, IMPERIAL's 2010 Annual Report) | In or about September 2010 |
| 16 | JEFFREY WILSON conversation with IMPERIAL's auditor | Audit related to IMPERIAL's fiscal year ended July 31, 2010 (*i.e.*, IMPERIAL's 2010 Annual Report) | In or about September 2010 |
| 17 | JEFFREY WILSON letter to IMPERIAL's auditor | Audit related to IMPERIAL's fiscal year ended July 31, 2010 (*i.e.*, IMPERIAL's 2010 Annual Report) | November 15, 2010 |
| 18 | CRAIG DUCEY letter to IMPERIAL's auditor | Audit related to IMPERIAL's fiscal year ended July 31, 2011 (*i.e.*, IMPERIAL's 2011 Annual Report) | October 5, 2011 |

| 19 | JEFFREY WILSON conversation with IMPERIAL's auditor | Audit related to IMPERIAL's fiscal year ended July 31, 2011 (*i.e.*, IMPERIAL's 2011 Annual Report) | In or about September 2011 |
| --- | --- | --- | --- |
| 20 | JEFFREY WILSON letter to IMPERIAL's auditor | Audit related to IMPERIAL's fiscal year ended July 31, 2011 (*i.e.*, IMPERIAL's 2011 Annual Report) | October 21, 2011 |

All in violation of 15 U.S.C. §§ 78m(b)(5) and 78ff, 17 C.F.R. §§ 240.13b2-2(a) and 240.13b2-2(b), and 18 U.S.C. § 2.

## COUNT 21
### (False Statements)

103) Paragraphs 1 through 88 of this Indictment are realleged and expressly incorporated herein as if set out in full.

104) On or about May 29, 2012, within the Southern District of Indiana and elsewhere, Defendant JEFFREY WILSON knowingly and willfully made a materially false, fictitious and fraudulent statement and representation in a matter within the jurisdiction of the Federal Bureau of Investigation (FBI), the U.S. Environmental Protection Agency (EPA) and the Internal Revenue Service (IRS); namely, during an interview by Special Agents of the FBI, EPA and IRS about the business operations of IMPERIAL and E-BIOFUELS:

    a) JEFFREY WILSON stated that he never compared the cost of off-spec biodiesel to feedstock, when in fact, as he then knew, CRAIG DUCEY had supplied him with a description and a detailed spreadsheet comparing the cost of off-spec biodiesel to feedstock;

b)    JEFFREY WILSON stated that he did not compare the cost of reprocessing off-spec methyl ester to making biodiesel from feedstock, when in fact, as he then knew, CRAIG DUCEY had supplied him with a description and a detailed spreadsheet comparing the cost of reprocessing off-spec methyl ester to making biodiesel from feedstock; and

c)    JEFFREY WILSON stated that he did not know if reprocessing off-spec methyl ester was more profitable than making biodiesel from feedstock, when in fact, as he then knew, CRAIG DUCEY had supplied him with a description and a detailed spreadsheet showing that reprocessing off-spec methyl ester was more profitable than making biodiesel from feedstock.

All of which is a violation of Title 18, United States Code, Section 1001.

A TRUE BILL:

FOREPERSON

JOSEPH H. HOGSETT
United States Attorney

by: _____
Steven D. DeBrota
Senior Litigation Counsel

_____
Thomas T. Ballantine
Senior Counsel

_____
Jake Schmidt
Special Assistant United States Attorney